IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEVADA

| | | |
|---|---|---|
| PRESTON BANKS | ) | |
| | ) | |
| | ) | CASE NO. |
| v. | ) | |
| | ) | JURY TRIAL DEMANDED |
| RESORTS WORLD LAS VEGAS, LLC | ) | |
| | ) | |
| | ) | |
| Defendant. | ) | |

**<u>COMPLAINT</u>**

Plaintiff Preston Banks (hereinafter referenced as “Plaintiff Banks,” by and through his undersigned counsel, files the following Complaint against Defendant Resorts World Las Vegas, LLC ("Defendant Resorts World" or "Resorts World") seeking monetary damages as well as attorneys’ fees, litigation expenses, and other relief, and in support thereof alleges the following:

## I. Jurisdiction and Venue

1. This Court has subject matter jurisdiction over Count One pursuant to 28 U.S.C. § 1331, because that claim arises under the Anti-Money Laundering Act of 2020, 31 U.S.C. § 5323(g), a law of the United States. Section 5323(g)(2)(B) independently confers jurisdiction on this Court, "without regard to the amount in controversy," because more than 180 days have elapsed since Plaintiff Banks filed

his complaint with the Secretary of Labor without a final decision, and there is no showing that the delay is due to Plaintiff Banks' bad faith.

2. This Court has supplemental jurisdiction over Count Two pursuant to 28 U.S.C. § 1367(a), because that claim arises from the same case or controversy as Count One — Defendant's termination of Plaintiff Banks' employment — such that both claims form part of the same case or controversy under Article III of the United States Constitution.

3. Venue is proper in this District under 28 U.S.C. § 1391(b)(1) and (b)(2). Defendant Resorts World resides in this District for venue purposes under 28 U.S.C. § 1391(c)(2), because it is subject to personal jurisdiction here, operating its principal gaming and hospitality facility in Las Vegas, Nevada. In addition, a substantial part of the events giving rise to Plaintiff Banks' claims — including his employment, his protected activity, and his termination — occurred in this District.

## II. The Parties

4. <u>Plaintiff Preston Banks ("Plaintiff Banks")</u> was employed by Defendant Resorts World from September 2022 until his illegal termination on September 29, 2025, serving as Compliance Director, and subsequently serving in an additional role as the International Compliance Director. Since 2022 and until the present, Plaintiff Banks has maintained his residence in Las Vegas, Nevada, which is in the United States District of Nevada for purposes of venue.

5. As Compliance Director and International Compliance Director, Plaintiff Banks was responsible for identifying suspicious activity, escalating concerns, documenting findings, and supporting Defendant Resorts World's Bank Secrecy Act ("BSA") and anti-money-laundering ("AML") compliance program. Plaintiff Banks did not have independent authority to file Suspicious Activity Reports, ban patrons, approve or deny casino credit, terminate Independent Agent relationships, or grant exceptions to Defendant Resorts World policy; those decisions rested with the Chief Compliance Officer and with Casino Operations, Credit, and other operational leadership.

6. Before joining Defendant Resorts World, Plaintiff Banks worked for approximately sixteen years as a Regulatory Specialist at the U.S. Department of the Treasury's Financial Crimes Enforcement Network ("FinCEN"), where his responsibilities included administering AML and counter-terrorist-financing regulations under the BSA, serving as a subject-matter expert on casino AML matters, drafting regulatory guidance, and liaising with domestic and foreign regulators.

7. As Compliance Director, Banks had lawful access to Defendant Resorts World's compliance records, systems, AML Committee materials, and internal communications.

8. During his employment, Defendant Resorts World issued Plaintiff Banks written recognition and discretionary bonuses, including $2,500 on April 5, 2023 (signed by then-President Scott Sibella) and $16,800 in recognition of his performance the following year February 2024 (signed by then-President Peter LaVoie).

9. Defendant Resorts World Las Vegas LLC ("Defendant Resorts World," or for convenience, "Resorts World"), is an indirect, wholly-owned subsidiary of Genting Berhad. Defendant Resorts World holds a legal license for nonrestricted gambling in Nevada.

10. Resorts World opened in June 2021 at 3000 Las Vegas Boulevard, as the first new resort on the Las Vegas strip since 2010, at a total cost of upwards of $4.3 billion. At the time of its opening, Resorts World was the most expensive resort property ever developed in Las Vegas, including a casino, and a 59-story tower housing over 3,500 rooms in three Hilton hotels. The Resorts World complex includes restaurants, entertainment venues, a retail center, a pool complex and other entertainment features.

## III. Factual Statement

### A. Resorts World Pays $10.5 Million Penalty and Settles with Nevada Gaming Commission

11. In or about sometime in the Fall of 2023, Resorts World became the subject of separate criminal and regulatory investigations conducted by the U.S.

Department of Justice ("DOJ" or "Justice Department") and the Nevada Gaming Control Board ("NGCB"). In March 2025, Defendant Resorts World agreed to pay a $10.5 million fine in a settlement with Nevada's Gaming Commission to resolve allegations of anti-money laundering compliance failures for permitting illegal bookmakers and fraudsters to gamble without adequate due diligence and source-of-funds verification. Further, the Nevada Gaming Control Board ("NGCB") alleged that Defendant Resorts World's AML Compliance Committee redacted or altered compliance meeting minutes, and were aware of numerous and repeated red flags in its AML oversight. *NGCB 24-04, Nevada Gaming Control Board v. Genting Berhad, et al., Stipulation for Settlement and Order,* March 27, 2025 ("NGCB Settlement").

12. In the Fall of 2023, the NGCB initiated an investigation of Resorts World and related companies concerning criminal and regulatory violations stemming from AML failures and deficiencies in permitting known gamblers to either gamble at, or invest in Resorts World's casino and hotel complex.

13. Around the same time, the U.S. Department of Justice appears to have initiated a criminal investigation, with the focus on illegal gambling businesses in California and stretching to Las Vegas casinos where the casinos and their executives encouraged and embraced illegal gamblers or bookmakers as patrons to facilitate illegal money laundering activities.

14. The NGCB conducted a comprehensive investigation involving interviews and investigative hearings of executives, casino hosts, employees and other individuals, and a review of extensive documents including policies, procedures and other records.

15. One year later, on August 15, 2024, the NGCB filed a *Complaint* before the Nevada Gaming Commission for disciplinary actions against Defendant Resorts World and other Respondents.[1] *See NGC 24-04, Nevada Gaming Control Board v. Genting Berhad et al., Complaint*, August 15, 2024 ("NGCB Complaint"). The *NGCB Complaint* included twelve separate charges and was later amended as part of a *Stipulation and Settlement* to ten charges for "unsuitable methods of operation" and anti-money laundering failures tied to illegal gambling at Resorts World casinos.[2] *See*

[1] As a licensee, Defendant Resorts World is subject to regulation by the Nevada Gaming Commission under Title 40 of the Nevada Revised Statute and the Regulations of the Commission. Under NRS 463.0129, the Nevada Legislature has set out the need for continued growth and success of the gaming industry which depends on public confidence and trust that such "[p]ublic confidence and trust can only be maintained by strict regulation of all persons, locations, practices, associations and activities related to the operation of licensed gaming establishments . . . ." See NRS 463.0129. A person approved by the Commission has an ongoing obligation to meet the standards required to obtain such approval including, without limitation, to be a person of good character, honesty and integrity and to refrain from activities and associations which may impact the interests of Nevada, the regulation of gaming, or the reputation of gaming in Nevada. Further, failure to continue to meet such applicable standards and qualifications constitutes' grounds for discipline. See NRS 463.170.

[2] The Nevada Gaming Control Board ("NGCB") is statutorily charged with determining whether a violation of the Nevada Gaming Control Act has occurred.

*NGC 24-04, Nevada Gaming Control Board v. Genting Berhad et al., Amended Complaint*, March 20, 2025 ("NGCB Amended Complaint"); *NGCB 24-04, Nevada Gaming Control Board v. Genting Berhad, et al., Stipulation for Settlement and Order,* March 27, 2025 ("NGCB Settlement").

16. Based on its investigation, the NGCB determined that Resorts World "welcomed certain individuals to wager at its casino over a period of numerous months while Resorts World executives and employees knew, or should have known, that certain individuals were likely illegal bookmakers." *See Amended Complaint* at § 28.

17. The NGCB also alleged that Resorts World's AML Compliance Committee ("AML Committee") and certain Resorts World executives and employees not only failed to fulfill the purpose and spirit of Resorts World's AML Program, but also failed to comply with various provisions of Resorts World's AML Program as well as with the Commission's regulations. *See Amended Complaint* at § 29.

---

See NRS 463.310(1). If the NGCB is satisfied that discipline is warranted, it shall initiate disciplinary action by filing a complaint with the Commission. See NRS 463.310(2). The Board is authorized to observe the conduct of licensees to ensure that gaming operations are not being operated in an unsuitable manner or by an unqualified or unsuitable person. See NRS 463.1405(1) and Commission Regulation 5.040.

18. The NGCB's investigation further revealed that there existed an overall lack of control within Resorts World and acceptance among Resorts World executives of a culture where information of suspicious or illegal activity is, at a minimum, negligently disregarded, or, at worst, willfully ignored for financial gain given the overall pressure for Resorts World to generate revenue and that the bonuses of Resorts World's executives are directly tied to the financial success of Resorts World. *See Amended Complaint* at § 30.

19. The NGCB's investigation further explained that Resorts World failed to fulfill its obligations as the holder of a Nevada gaming license and caused damage to the reputation of the State of Nevada and Nevada's gaming industry. *See Amended Complaint* at §§ 30- 31. The NGCB reserved the right to revisit the investigation against Resorts World in the event that the Justice Department brings a criminal action for violations of the BSA and AML laws. *See NGCB at § 6; Amended Complaint* at § 32.[3]

20. On March 27, 2025, the NGCB, Genting and Resorts World reached a settlement, requiring Genting and Resorts World to (1) pay a $10.5 million fine,

[3] Federal law requires casinos to establish and maintain a written AML compliance program reasonably designed to assure and monitor compliance with the BSA, including internal policies, procedures, and controls and a system of internal controls to assure ongoing compliance. 31 U.S.C. § 5318(h)(1)(A); 31 C.F.R. § 1021.210(b)(1), (b)(2)(i). A casino's program must also include procedures for using available information to determine the occurrence of transactions or patterns of transactions required to be reported as suspicious. 31 C.F.R. § 1021.210(b)(2)(v)(B).

along with interest; and (2) ensure compliance with conditions, which included: (a) maintenance of its anti-money laundering compliance program and procedures; (b) retention of employee AML training records and AML Committee meeting minutes; (c) training of independent agents; (d) conduct an independent audit to review, evaluate and report on Resorts World's compliance with its AML Program; and (e) maintenance of staff for AML compliance. *See NGCB Settlement.*

21. In the remediation portion of the settlement, Resorts World and other Respondents acknowledged that their AML Program "needed enhancements to address certain compliance risks." To this end, Resorts World implemented "extensive changes to not only address the areas identified but also to enhance the overall AML Program and compliance function, with the aim of having industry-leading policies, procedures and practices." *NGCB Settlement* at §5.

22. Further, "[u]pon learning of allegations about certain patrons' source of funds and potential compliance concerns," Resorts World fully cooperated with the NGCB investigation. Additionally, Defendant Resorts World made changes to its leadership, replacing its CEO, COO and CFO, creating a new position of Chief Compliance Officer, and appointing a new Board of Directors. *NGCB Settlement* at §5.

23. To remediate compliance and culture of compliance deficiencies, Resorts World completed a number of remedial actions, including: (a) conducting

in-person enhanced training to over 1,100 employees; (b) revising its governance documents and decision-making for its AML Committee; (c) executive and key team members attendance of an AML seminar; (d) engaging the UNLV International Center for Gaming Regulation to create and host a customized gaming compliance program; (e) hiring additional compliance staff; (f) requesting vendors to provide software enhancements to help automate and streamline AML functions; (g) adopting in August 2023 policy to ban patrons identified as having criminal convictions related to an illegal gambling or money laundering crime. *NGCB Settlement* at §5.

24. As outlined in the *NGCB Amended Complaint at §28*, Resorts World "welcomed certain individuals to wager at its casino over a period of numerous months while executives and employees knew, or should have known, that certain individuals were likely illegal bookmakers." In addition, the *Amended Complaint* cites certain executives and employees who not only failed to comply with Resorts World's AML Program but violated Nevada Gaming Commission regulations. *NGCB Amended Complaint at §29*.

25. The NGCB noted that Resorts World originally adopted in 2021 an AML program that was approved by executive management and applied to its officers and employees.

26. Resorts World's AML Program requires its employees to internally report unusual and suspicious activity and violations of the AML Program to their supervisor or the AML Compliance Officer. Resorts World's AML Compliance Officer was responsible for its AML Program, including ensuring the filing of Suspicious Activity Reports ("SARs") with FinCEN. *NGCB Amended Complaint at §§ 35-36.*

27. Resorts World's AML Committee was responsible for coordination and implementation of the AML Program and to advise the AML Compliance Officer on matters, including the filing of SARs with FinCEN, and making recommendations on terminating or restricting customer relationships. *NGCB Amended Complaint at § 37.*

28. Resorts World's AML Program describes different types of suspicious activities specified by Title 31 and it includes suspicions regarding a patron's source of funds. Under the AML Program, a patron "with incomplete BSA information will be considered barred ... [and] will be restricted from gaming activity until the required information is obtained." Further, if the patron "poses a significant AML risk, the Company may ban the patron from further activities with the Company." *NGCB Amended Complaint at §§ 40-41.*

29. On April 22, 2025, Defendant Resorts World appointed Jennifer Roberts to the newly created Chief Compliance Officer position ("CCO Jennifer Roberts"). CCO Jennifer Roberts became Plaintiff Banks' direct supervisor, and she

was tasked with reviewing and evaluating Defendant Resorts World's compliance operations in the aftermath of the Nevada Gaming Commission settlement.

B. Plaintiff Banks Identifies and Reports Suspicious Activity Involving Patrons from Argentina ("Argentina Scheme")

30. Beginning in late 2022, Plaintiff Banks identified a pattern of suspicious activity involving a group of patrons, predominantly from Argentina, who gambled at Defendant Resorts World's casino on weekends and whose sources of funds could not be verified because the businesses listed on their casino credit applications did not exist or could not be located. Plaintiff Banks devoted significant time and resources to investigating this large group of patrons, who were engaged in suspicious activity for potential violations of Resorts World's AML Policy and related controls.

31. In 2023, Plaintiff Banks recommended to his supervisors and the AML Committee that Defendant Resorts World prohibit third-party marker payments by patrons Juan Guevara, Maximiliano Palermo, and Juan Manuel Iriarte. The AML Committee adopted these bans.

32. By 2024, the Argentina Scheme membership grew to include patrons from Mexico, Paraguay, Uruguay, Italy, and Spain, and was estimated to range from 60 to 150 individuals. Defendant Resorts World's own records describe the group's suspicious activities as including unverified source of funds, credit fraud, repeated

third-party marker payments, coordinated or "coached" wagering, chip passing, chip walking, bankrolling, minimal gaming, offsetting bets, and bill-stuffing.

33. Plaintiff Banks' contemporaneous records identified specific third-party marker payments made during this period, including approximately $668,250 across eight payments by Maximiliano Palermo (Jan.–Aug. 2023), approximately $284,000 across six payments by Juan Iriarte (Jul.–Aug. 2024), and approximately $1,106,000 across fourteen payments by Juan Guevara (Jul. 2024).

34. In or around September 2024, Plaintiff Banks identified and reported to the AML Compliance Committee that a member of the Argentina Scheme, Octavio Montanari, paid approximately $99,000 in cash for hotel rooms and expenses for eleven accompanying individuals — a payment that implicated federal cash-reporting requirements and raised AML concerns regarding the source of the funds under 31 U.S.C. § 5331 and 31 C.F.R. §§ 1010.330 and 1021.330(c).

35. In June 2024, Plaintiff Banks created a Source of Funds and Income Attestation Policy and form and advised Marketing that "relying on attestation statements alone is insufficient," requesting documentation of patrons' business ownership and income.  This Form was then used to document and verify a patron's business ownership or employment and income from such businesses.

36. On September 11, 2024, Plaintiff Banks requested that Maximiliano Palermo and two other patrons be added to Defendant Resorts World's High-Risk

Patrons Chart based on their third-party payment activity; Defendant Resorts World had by then filed more than fifty BSA-required suspicious activity reports concerning these patrons.

37. At the September 17, 2024 AML Committee meeting, after a Company executive noted that Palermo's father had previously been implicated in an unlicensed money-transmitting matter involving Wynn Las Vegas, Plaintiff Banks stated that prohibiting further third-party payments "should deter any possible illicit money transmittals" if Palermo were engaged in similar conduct.[4] The AML Committee took no further action against members of the Argentina Scheme despite

---

[4] In August 2024, Resorts World received an anonymous message, forwarded to Plaintiff Banks by Marketing Vice President Herman Suarez, alleging that Independent Agent Julian Zubero and an associate, Horacio Fenocchio, were recruiting insolvent individuals to obtain casino credit in their names for the benefit of others. The sender retracted the allegation approximately one hour after sending it. Resorts World's General Counsel directed that the matter be investigated notwithstanding the retraction because of a potential connection to the Argentina Scheme. Based on his investigation, Plaintiff Banks reported to General Counsel Gardner that the individuals were not connected to the Argentina Scheme. Plaintiff Banks' investigation also did not identify suspicious activity by the individuals identified in the tip who were actual Resorts World patrons. As a result, this matter was not raised before the AML Committee between August 2024 and August 2025 because the tip named different individuals from the Argentina scheme, Plaintiff Banks' investigation did not identify suspicious activity by the relevant patrons, the allegation was retracted the same day, and described a materially smaller and differently constituted patron group. Subsequently, on August 20, 2025, at CCO Roberts' request, Plaintiff Banks forwarded her the August 2024 anonymous tip email chain and the associated patron list. On August 28, 2025, Roberts discussed the anonymous tip with Senior Vice President of Finance Terry Vavra, who responded by email that, had the information been connected earlier, "we potentially could have saved the company millions."

the number and frequency of suspicious activities and additional information collected by Plaintiff Banks and reported to the AML Committee by him.

38. Plaintiff Banks investigated Independent Agent Jesús Blanco, the Argentina Scheme's representative, and identified Blanco's ownership interests in numerous businesses and connections to offshore entities identified in the Paradise Papers.

39. After Blanco requested a $250,000 temporary casino-credit line on November 27, 2024, and a Credit Department executive asked Compliance to perform EDD on him, Plaintiff Banks presented EDD findings concerning Blanco to the AML Compliance Department meeting in December 2024, after then–Vice President of Compliance Tonya Henderson directed that the matter be presented as "information only," rather than seeking approval to take formal action against Blanco and other members of the group.

C. Despite Significant Evidence of Suspicious Activity and Suspected BSA/AML Violations, Resorts World Delayed or Limited Its Response to Members of the Argentina Scheme

40. As set forth herein, Plaintiff Banks continued to raise, report, and document suspicious activity associated with the Argentina Scheme and conduct he reasonably believed constituted violations of the BSA and related federal AML requirements. Throughout his investigation, Plaintiff Banks recommended that Resorts World take increasingly severe actions against members of the Argentina

Scheme, ranging from restrictions on third-party marker payments and restricted-gaming bans on specific games to gaming-only bans and ultimately full property bans. Plaintiff Banks' supervisors and the AML Committee repeatedly minimized concerns, delayed review, and took incomplete or inadequate action under Resorts World's AML Policy and related controls.

41. In January 2025, Plaintiff Banks requested that Palermo and two other high-risk patrons be added to Defendant Resorts World's facial-recognition surveillance system in order to facilitate detection and monitoring of Palermo's suspicious and illegal activity.

42. On April 18, 2025, Plaintiff Banks met with Marketing executives Herman Suarez and Greg Shulman and was able to confirm a link between Blanco and previously identified members of the Argentina Scheme, including Octavio Montanari, Juan Guevara, and Maximiliano Palermo. In particular, Plaintiff Banks uncovered the role of these individuals in hotel logistics, administration, and patron recruitment for the Argentina Scheme and its members. On May 5, 2025, Plaintiff Banks prepared and disseminated a detailed report on this information for review by CCO Roberts and other Compliance personnel for inclusion in the AML Committee's action items.

43. During an AML Committee meeting sometime in the first half of 2025, Plaintiff Banks presented detailed information of suspicious activities involving

members of the Argentina Scheme and recommended modification of restrictions on certain members of the Argentina Scheme. In response, Executive Vice President of Casino Operations Al Meranto sought to minimize the seriousness of the suspicious activities by characterizing the patrons' suspicious activities as "cultural." The AML Committee did not take the additional action Plaintiff Banks recommended at that meeting.

44. Following the April 18, 2025 AML Committee meeting, Defendant Resorts World relaxed Palermo's gaming-only ban to a "restricted gaming only" ban; on May 21, 2025 the AML Committee (then led by CCO Roberts) required Palermo to complete AML Independent-Agent training and reinstated the gaming-only ban pending completion; on May 22, 2025 several patrons were banned for coaching and "two or more people working together"; and on June 19, 2025 Palermo and other group members were banned on the same basis.[5]

45. Separately, in July or August 2025, Defendant Resorts World approved an exception to its Third-Party Payment Policy permitting Independent Agent Blanco's commission check to be applied toward outstanding casino credit owed by

[5] In April 2025, after obtaining authorization from then–Chief Compliance Officer Henderson, Plaintiff Banks voluntarily provided information to Nevada Gaming Control Board Agent Brandon Hasse concerning suspicious patron activity at Defendant Resorts World unrelated to the Argentina Scheme. Plaintiff Banks reasonably and in good faith believed that the conduct he reported implicated or violated applicable requirements under the BSA and Nevada gaming laws or regulations.

other patrons associated with the Argentina Scheme. Plaintiff Banks disagreed with this exception and did not approve it because it was contrary to the Third-Party Payment Policy.

46. In August 2025, CCO Roberts instructed Plaintiff Banks to prepare a written timeline concerning the Argentina Scheme activity.

D. Plaintiff Banks Provides Information Concerning the Argentina Scheme and Suspected BSA/AML Violations

47. On September 2, 2025, Plaintiff Banks provided information by email to CCO Jennifer Roberts, Compliance Manager Leatrice Lawrence-Joyce, and Senior AML Compliance Analyst Jessamine Yap through a comprehensive report, including a detailed timeline and supporting documents, concerning suspicious activities associated with the Argentina Scheme and conduct Plaintiff Banks reasonably believed constituted violations of the BSA and related federal AML requirements ("September 2, 2025 Report" or "report")). The Report also documented a pattern of delayed, incomplete, or inadequate compliance responses by Compliance personnel, the AML Committee, and other Resorts World officials to those activities and concerns.

48. The next day, on September 3, 2025, CCO Jennifer Roberts directed a priority internal review of the material, instructing reviewers to address how Compliance had treated the underlying activity, how it had been raised internally and at AML Committee meetings, and whether concerns had been raised about the

Argentina Scheme. CCO Roberts added AML Compliance Analyst Nicholas Novella to the review, and directed consolidated edits to be routed to her privately.[6]

49. After approximately two years of investigation and delayed, incomplete, or inadequate responses, on September 11, 2025, Resorts World implemented severe bans and remedial actions against significant members of the Argentina Scheme. Specifically, Resorts World banned twenty-eight patrons associated with the credit-fraud component of the group, and referred their accounts to the Clark County District Attorney's Office for collection of approximately $12 to $13 million in unpaid casino credit.

50. The next day, September 12, 2025, Plaintiff Banks met privately and individually with CCO Jennifer Roberts. During that meeting, Plaintiff Banks and CCO Roberts discussed the status of ongoing and future compliance projects, including quarterly Form 8300 training for hotel management, one-on-one BSA/AML training for newly hired casino hosts, and sportsbook staff training. During this meeting, CCO Roberts did not communicate any performance concerns to Plaintiff Banks or his reporting of the Argentina Scheme.

[6] On September 5, 2025, Compliance Officer Lawrence-Joyce provided CCO Jennifer Roberts additional information concerning the Argentina Scheme. On September 12, 2025, Compliance Analyst Novella revised and supplemented the timeline, adding dates and categories of BSA-required reports, credit amounts extended, and outstanding balances.

51. Throughout his employment at Defendant Resorts World, Plaintiff Banks was promoted to handle additional responsibilities as International Compliance Director and received no negative warnings or performance reviews.

E. Plaintiff Banks Is Summarily Terminated Following His Report of the Argentina Scheme, in a Decision Attributed to Senior Leadership

52. On September 29, 2025, CCO Roberts directed Plaintiff Banks to report to a meeting with Defendant Resorts World's Human Resource Director Bob Napierala ("HR Director Napierala"). Shortly thereafter, Plaintiff Banks met with CCO Roberts and HR Director Napierala, during which HR Director Napierala told Plaintiff Banks that he was terminated effective immediately because of “the Argentina Scheme”—the same subject matter addressed in Plaintiff Banks’ September 2, 2025 Report. Plaintiff Banks responded that he had detected the scheme and protested that RWLV was terminating the person who had identified it, stating, “I detected it, you’re killing the author.” HR Director Napierala responded that the decision to terminate Plaintiff Banks came from “the C-suite” and that no one else on the Compliance team had been terminated.

53. Plaintiff Banks was terminated twenty-seven (27) days after he provided the detailed September 2, 2025 Argentina Scheme Report documenting suspicious activity and conduct he reasonably believed constituted violations of the BSA and related federal AML requirements.

54. As a result of his termination, Plaintiff Banks lost his salary, employee benefits, and the opportunity for future incentive compensation, including discretionary bonuses of the kind Defendant Resorts World had awarded him in prior years. Plaintiff Banks alleges that his termination from a senior compliance role has caused professional and reputational harm and emotional distress.

F. Plaintiff Banks Meets with NGCB and Learns that His September 2, 2025 Report Has Been Altered

55. On March 11, 2026, Plaintiff Banks met with NGCB Agent Joseph Schibetta and two other agents for an interview concerning Resorts World's handling of the Argentina Scheme and enforcement of its AML Policy. During this interview, the NGCB agents showed Plaintiff Banks a copy of Plaintiff Banks' September 2, 2025 Argentina Scheme Report that had been provided to the NGCB by Resorts World ("Resorts World Version"). Plaintiff Banks reviewed the Resorts World Version of his report and informed the NGCB Agents that the Report had been altered and omitted relevant facts contained in the original version he submitted to CCO Roberts on September 2, 2025. Specifically, based on his information and belief, Plaintiff Banks explained that the Resorts World Version did not contain entries relating to: (a) the exception to the Third-Party Payment Policy involving Independent Agent Blanco, which was approved over Plaintiff Banks' objection; (b) EVP of Casino Operations Meranto's characterization of the Argentina Scheme

suspicious activities as "cultural" at an AML Committee meeting in the first half of 2025; and (c) the development and implementation of a Third-Party Payment Policy.

G. Plaintiff Banks Submits Whistleblower Complaints to Federal Agencies

56. On December 5, 2025, Plaintiff Banks filed a whistleblower-retaliation complaint against Defendant Resorts World with the U.S. Department of Labor's Occupational Safety and Health Administration ("OSHA") under the Anti-Money Laundering Act of 2020 ("AMLA"), docketed as Case No. 301068236. On February 9, 2026, Defendant Resorts World submitted a Position Statement and supporting exhibits to OSHA. On July 5, 2026, Plaintiff Banks submitted a Formal Rebuttal to Defendant Resorts World's Position Statement.

57. More than 180 days have elapsed since the original filing of Banks' OSHA complaint without a final agency decision.

58. In addition to his internal reporting to Defendant Resorts World, and the filing of a whistleblower complaint with OSHA, Plaintiff Banks, through counsel, submitted a whistleblower complaint to the U.S. Department of the Treasury's Financial Crimes Enforcement Network ("FinCEN") Office of the Whistleblower, assigned Tip, Complaint, or Referral code TCR-1324-C5R4W, reporting suspected Bank Secrecy Act and anti-money-laundering violations at Defendant Resorts World, including suspicious casino credit activity, unverified source-of-funds information, third-party marker payments, and Defendant Resorts

World's systemic failure to escalate and act on the suspicious activity underlying the Argentina Scheme. On July 13, 2026, Plaintiff Banks submitted supplemental information further supporting that tip, which FinCEN's Office of the Whistleblower acknowledged receiving the same day.

59. Separately, on June 6, 2026, Plaintiff Banks, through counsel, submitted a whistleblower complaint to the U.S. Department of Justice under its Corporate Whistleblower Awards Pilot Program, assigned DOJ tracking number 20260606-0001. That submission reported the same suspected Bank Secrecy Act and anti-money-laundering violations underlying the Argentina Scheme, including suspected casino credit fraud, third-party marker payments, and possible unlicensed money transmission or informal value-transfer activity, and identified potential criminal or civil forfeiture exceeding the Pilot Program's $1 million threshold. Plaintiff Banks' submission also provided the Department of Justice with information concerning Defendant Resorts World's retaliation against him for reporting the suspected violations and related activity described above.

## IV. Plaintiff Banks' Claims

*Count One: Breach of 31 U.S.C. § 5323(g) —*
*Retaliation Against a Whistleblower Under the Anti-Money Laundering Act*

60. Plaintiff Banks realleges and incorporates by reference Paragraphs 1 to 59 as if fully set forth herein.

61. The Anti-Money Laundering Act 31 U.S.C. § 5323(g) prohibits an employer from retaliating against a whistleblower because of a lawful act in providing information to a supervisor or other authorized employee concerning conduct within the statute's protected subject matter, including conduct the whistleblower reasonably believes constitutes a violation of any law, rule, or regulation subject to the jurisdiction of the Department of the Treasury or 18 U.S.C. §§ 1956, 1957, or 1960.

62. Plaintiff Banks was a “whistleblower” within the meaning of 31 U.S.C. § 5323 and 29 C.F.R. § 1992.101 because, while employed by Defendant Resorts World, he engaged in one or more of the protected actions described in 29 C.F.R. § 1992.102(b). As alleged above, Plaintiff Banks provided information to his employer, supervisors, and other authorized Compliance personnel relating to suspected violations of the BSA and regarding conduct that, based on his training, experience, and the information known to him, he reasonably believed constituted violations of laws, rules, or regulations subject to the jurisdiction of the Department of the Treasury. AMLA protects a whistleblower against retaliation for providing qualifying information to an employer, including when that information is provided as part of the whistleblower’s job duties. Accordingly, Plaintiff Banks’ performance of his compliance responsibilities did not exclude him from AMLA’s definition of a whistleblower when he engaged in the protected reporting activity alleged herein.

63. On or about September 2, 2025, Plaintiff Banks provided detailed information to CCO Roberts and other Compliance personnel concerning suspicious activities associated with the Argentina Scheme and conduct that, based on his training, experience, and the information known to him, he reasonably believed constituted violations of the BSA and other Treasury-administered requirements, including concerns involving source of funds, third-party payments, movement of value, and possible unlicensed money transmission. The report also documented a pattern of delayed, incomplete, or inadequate compliance responses by Resorts World personnel to those concerns over approximately two years. The information Plaintiff Banks provided also implicated federal casino AML-program and internal-control requirements, including requirements to maintain a written AML program reasonably designed to assure and monitor BSA compliance and a system of internal controls to assure ongoing compliance. 31 U.S.C. § 5318(h)(1)(A); 31 C.F.R. § 1021.210(b)(1), (b)(2)(i).[7]

64. On September 29, 2025, twenty-seven days after Plaintiff Banks' September 2 report, he was terminated during a meeting attended by CCO Roberts and HR Director Napierala. As alleged above, HR Director Napierala told Plaintiff

[7] Plaintiff Banks' submission included detailed information relating to suspicious activity, third-party payments, source-of-funds concerns, coordinated and minimal gaming, casino-credit exposure, possible movement of value or unlicensed money transmission, internal handling of these issues within Defendant Resorts World's compliance process, patron restrictions, and the timing of any remedial action.

Banks that he was being terminated because of "the Argentina Scheme" and that the termination decision came from "the C-suite."

65. Defendant Resorts World knew or suspected that Plaintiff Banks had engaged in protected activity because CCO Roberts personally received his September 2, 2025 report and directed a priority internal review of that report within sixteen hours of receiving it.

66. Plaintiff Banks' protected activity, including his September 2, 2025 report and his repeated internal escalations described above, was a contributing factor in Defendant Resorts World's decision to terminate his employment. Among other things, Defendant Resorts World's Chief Compliance Officer, Jennifer Roberts, directed an internal review of Plaintiff Banks' report within sixteen hours of receiving it, as described above; Plaintiff Banks was terminated twenty-seven days later; and Human Resources Director Napierala told Plaintiff Banks at the time of his termination that he was being terminated because of "the Argentina Scheme" — the same subject matter addressed in Plaintiff Banks' September 2, 2025 Report.

67. On December 5, 2025, Plaintiff Banks filed a whistleblower-retaliation complaint against Defendant Resorts World with the U.S. Department of Labor's Occupational Safety and Health Administration ("OSHA") under the Anti-Money Laundering Act of 2020 ("AMLA"), docketed as Case No. 301068236, pursuant to

31 U.S.C. § 5323(g)(2)(A) (by "filing a complaint with the Secretary of Labor in accordance with the requirements of [31 U.S.C. § 5323(g)(3)(A)]").

68. More than 180 days have elapsed since the original filing of Plaintiff Banks' OSHA complaint without a final agency decision. Under 31 U.S.C. § 5323(g)(2)(B), "if the Secretary of Labor has not issued a final decision within 180 days of the filing of a complaint under subparagraph (A)," then Plaintiff Banks may "bring[] an action against the employer at law or in equity in the appropriate district court of the United States." To this date no final decision has issued within 180 days of the filing of Plaintiff Banks' OSHA complaint.

69. As a direct and proximate result of his termination, Plaintiff Banks lost his salary, employee benefits, and the opportunity for future incentive compensation, including discretionary bonuses of the kind Defendant Resorts World had awarded him in prior years.

70. Plaintiff Banks alleges that his termination from a senior compliance role has caused professional and reputational harm and emotional distress.

*Count Two: Tortious Discharge in Violation of Public Policy*
*(Nevada Common Law)*

71. Plaintiff Banks realleges and incorporates by reference Paragraphs 1 to 59 as if fully set forth herein.

72. Nevada recognizes a common-law cause of action for tortious discharge where an employer terminates an employee for reasons that violate a clear

and compelling public policy of the State of Nevada, regardless of whether the employee was employed at will. *Allum v. Valley Bank of Nevada*, 114 Nev. 1313 (1998); *Wiltsie v. Baby Grand Corp.*, 105 Nev. 291 (1989).

73. Nevada has a strong and well-established public policy favoring the reporting of suspected financial misconduct and encouraging employees of regulated financial institutions — including Nevada's BSA/AML-regulated gaming licensees — to report suspected violations of law without fear of retaliation. *See Allum*, 114 Nev. 1313 (recognizing tortious-discharge claim of a bank employee terminated for reporting suspected regulatory violations).

74. Plaintiff Banks engaged in reporting activity protected by this public policy by repeatedly reporting suspected BSA/AML violations and related misconduct, both internally to Defendant Resorts World's compliance leadership, as described above, and externally to authorities outside Defendant Resorts World.

75. Defendant Resorts World knew of Plaintiff Banks' protected reporting activity, including through CCO Roberts' direct receipt of the September 2, 2025 report and the priority review she directed the following day.

76. Plaintiff Banks' protected reporting activity was the proximate cause of Defendant Resorts World's decision to terminate his employment on September 29, 2025.

77. As a direct and proximate result of his wrongful termination, Plaintiff Banks has suffered damages, including lost wages, lost employee benefits, lost opportunity for future incentive compensation, professional and reputational harm, and emotional distress.

78. Defendant Resorts World's conduct was undertaken with oppression, fraud, or malice, express or implied, entitling Plaintiff Banks to an award of punitive damages pursuant to NRS 42.005.

**WHEREFORE,** Plaintiff Preston Banks respectfully requests that this Court enter judgment in his favor and against Defendant Resorts World Las Vegas, LLC, and award him the following relief:

A. On Count One, all relief available under 31 U.S.C. § 5323(g)(3)(C), including reinstatement or front pay in lieu thereof, two times the amount of his back pay with interest, compensatory damages including litigation costs, expert witness fees, and reasonable attorneys' fees, and any other appropriate remedy;

B. On Count Two, compensatory damages for lost wages, lost benefits, lost opportunity for future incentive compensation, professional and reputational harm, and emotional distress, in an amount to be proven at trial, together with punitive damages;

C. Pre-judgment and post-judgment interest as allowed by law;

D. Costs of suit and reasonable attorneys' fees to the extent allowed by statute or law; and

E. Such other and further relief as the Court deems just and proper.

**Jury Demand**

Plaintiff Banks hereby demands a trial by jury on all issues of fact and damages stated herein.

Respectfully submitted,

By: _____/s/_________________

Kathleen Bliss
Kathleen Bliss Law PLLC
170 South Green Valley Parkway
Suite 300
Henderson, NV 89012
(702) 318-7375
kb@kathleenblisslaw.com

_____/s/_________________

Michael Volkov (DC 367348)
*Pro Hac Vice (pending)*
The Volkov Law Group PC
1015 15th Street, N.W., 6th Floor.
Washington, D.C. 20005
(240) 505-1992
mvolkov@volkovlaw.com